UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| WASTE ACTION PROJECT, | CASE NO. C17-5445 BHS |
|                    Plaintiff, | ORDER GRANTING IN PART |
|    v. | AND DENYING IN PART |
| | PLAINTIFF'S MOTION FOR |
| PORT OF OLYMPIA, | SUMMARY JUDGMENT AND |
| | DENYING DEFENDANT'S |
|                Defendant. | MOTION FOR SUMMARY |
| | JUDGMENT |

This matter comes before the Court on Plaintiff Waste Action Project's ("WAP") motion for summary judgment, Dkt. 62, and Defendant Port of Olympia's ("Port") cross motion for summary judgment, Dkt. 80. The Court has considered the pleadings filed in support of and in opposition to the motions and the remainder of the file and hereby grants in part and denies in part WAP's motion and denies the Port's motion for the reasons stated herein.

# I.   PROCEDURAL HISTORY

On June 12, 2017, WAP filed a complaint against the Port asserting two claims for violation of the Clean Water Act, ("CWA") as amended, 33 U.S.C. § 1365.

On August 21, 2019, WAP filed a motion for summary judgment.  Dkt. 62.  On September 9, 2019, the Port responded and filed a cross motion for summary judgment. Dkt. 80.  On September 30, 2019, WAP replied to its motion and responded to the Port's motion.  Dkt. 109.  On October 4, 2019, the Port replied to WAP's response.  Dkt. 118. On October 8, 2019, WAP filed a surreply requesting the Court strike certain material contained in the Port's reply.  Dkt. 123.

# II.   FACTUAL BACKGROUND

## A.    The Facility

The Port owns a marine terminal facility that operates as both a log yard and a marine cargo transportation facility (SIC Codes 4491 and 2411).  Dkt. 63-1 at 8.[1]  The site is approximately 67 acres, mostly paved, located on the Port Peninsula, jutting north into Budd Inlet from downtown Olympia.  *Id.* at 11.  The Facility is covered by National Pollutant Discharge Elimination System ("NPDES") Industrial Stormwater General Permit ("ISGP") No. WAR001168.  *Id.* at 8.  The first relevant permit expired on January 1, 2015, Dkt. 62-3, and the current permit is valid from January 2, 2015 to December 31, 2019, Dkt. 62-4.

---

[1] All page citations are ECF pagination.

Stormwater from the facility discharges to Budd Inlet, which is an impaired

waterbody included on Washington's "303(d)" list for dissolved oxygen and dioxin.  Dkt.

63-2; *Pronsolino v. Nastri*, 291 F.3d 1123, 1127-29 (9th Cir. 2002) (explaining that

303(d) listed waterbodies are those areas for which the states must set more stringent

standards to protect water quality).  Stormwater discharges at the Port are monitored from

two drainage basins, Basin A and Basin C, at sampling points A02 and TF1, respectively.

Dkt. 63-1 at 13–14, 27–28.  Other industrial stormwater discharges from Basins A and C

go unmonitored, including discharges from points P1-P4, and discharges from the

facility's wharf on the facility's western edge.  *Id.* at 14.

**B.  Prior Suit and Treatment Facility**

On November 26, 2011, the Court entered a consent decree ending a CWA

citizen's suit against the Port.  *Olympians for Pub. Accountability v. Port of Olympia*,

C09-5756-BHS, Dkt. 51 (W.D. Wash. Nov. 27, 2011).  As part of that decree, the Port

"agreed to design, engineer, and construct a stormwater treatment facility [("SWTF")]. . .

."  Dkt. 80 at 6.  The Port spent years developing and testing various systems, and

eventually settled on the Fenton's Oxidization Process.  Dkt. 83, ¶¶ 8–10.  The Port

contends that the SWTF was fully operational on December 31, 2014.  Dkt. 85, ¶ 16.

On January 28, 2015, the Peroxide Containment System in the SWTF failed,

resulting in a release of nine thousand six hundred (9,600) gallons of a fifty percent

(50%) Hydrogen Peroxide Solution.  Dkt. 63-11, § 3, ¶ 5.  On January 29, 2015, Ecology

inspectors Paul Stasch, John Diamant, and Steve Eberl arrived at the Port and demanded

access to inspect the SWTF.  Dkt.85, ¶ 18.  The Port denied the inspectors access

contending that the area was under the control of the Port's emergency control contractor. *Id.* ¶ 19. "Testing of downstream storm drain lines, catch basins, and a pumping station indicated that no material left the site and entered Budd Inlet via the storm drain system." Dkt. 81-6 at 4.

On June 10, 2016, Ecology and the Port entered Agreed Order #13316. Dkt. 81-6. The order identified two violations of the Port's ISGP, which were the containment requirement for the chemical liquid and a failure to report a change to its engineering report regarding the design of the containment area. *Id.* at 4–5. Pursuant to the order, the Port agreed to submit adequate engineering plans, pay a penalty of $4,000, and have the SWTF fully operational by October 31, 2016. *Id.* at 5.

On October 11, 2016, the Port requested a two-month extension of the SWTF deadline. Dkt. 81-10 at 3. In December of 2016, Ecology and the Port entered Agreed Order #13881, which granted that extension. *Id.* In the cover letter granting that order, Ecology stated that no further extensions would be granted and that "effective January 1, 2017, all benchmarks that are exceeded will need to be addressed through the Corrective Actions required by Industrial Stormwater General Permit Condition S8." *Id.* at 2.

On March 17, 2017, Ecology issued the Port a notice of compliance with Agreed Order #13316 as amended by Agreed Order #13881. Dkt. 81-11.

**C.     Current Suit and Enforcement Action**

In April 2017, WAP sent the Port a notice of intent to sue letter. Dkt. 1 at 21–63. The letter alleges numerous violations of the Port's ISGP. *Id.* On June 12, 2017, WAP filed the instant complaint. *Id.* at 1–20. The Court granted numerous stipulated

extensions of the trial date and pretrial deadlines while the parties engaged in settlement negotiations. *See* Dkt. 29, 38.

Meanwhile, the Port exceeded the benchmark for Chemical Oxidation Demand ("COD") for three quarters during 2017, which triggered a Level 3 Corrective Action under ISGP Condition S8. Dkt. 63-11, § 3, ¶ 8. On May 11, 2018, the Port sought a modification of coverage under the permit requesting a 24-month extension of the Level 3 Corrective Action deadline to September 21, 2020. Dkt. 81-12. The Port stated that it was continuing to work with its consultants to improve the SWTF so that it could meet the COD benchmarks going forward. *Id.* On August 1, 2018, Ecology denied the request stating that the Port has not met the intent of the permit. Dkt. 81-13.

On September 25, 2018, the Port submitted an engineering design report addendum for Ecology's review. Dkt. 81-15. On October 21, 2018, Ecology responded recommending upgrades to the Port's plans. Dkt. 81-16. Based on the Port's improvements to its SWTF, it met the COD benchmarks for the first two quarters of 2019. Dkt. 63-11, § 3, ¶ 17. On July 30, 2019, Ecology and the Port entered Agreed Order #16584. *Id.* The Port agreed to four categories of corrective actions "in order to consistently meet the permit benchmarks beginning July 1, 2020," which are (1) an alternatives analysis evaluation, (2) an engineering report and implementation of improvements, (3) the implementation of best management practices ("BMPs") and other improvements, and (4) permit compliance. *Id.* at 6–8.

# III. DISCUSSION

## A. Motions to Strike

In its reply/response, WAP moves to strike Dkts. 81-7, 81-15, 82-1, 82-2, 82-4, 82-5, 82-6. Dkt. 109 at 28–29. The Court denies the motion as moot because the Court does not rely on any of these documents in considering the parties' motions.

In its surreply, WAP moves to strike the Second Declaration of Christopher Waldron and arguments regarding whether WAP may enforce this citizen suit. Dkt. 123. The Court denies the motion as moot because it does not rely on that declaration and it rejects the Port's arguments on the issue of jurisdiction.

## B. Subject Matter Jurisdiction

The Port argues that the Court lacks jurisdiction over this suit because (1) "Ecology is diligently prosecuting permit compliance," (2) WAP's claims are for wholly past violations, and (3) WAP's allegations are not in good faith. Dkt. 80 at 35–42.

### 1. Enforcement

The CWA precludes numerous types of citizen suits, two of which are relevant in this matter. First, a citizen suit is precluded "if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States . . . ." 33 U.S.C. § 1365(b)(1)(B). Although the Port cites and misquotes this provision in its motion, Dkt. 80 at 39, the Port states in its reply that it "erroneously cited the § 1365 bar, but it relies" on the other relevant provision, Dkt. 118 at 2 n.1. Therefore, the Court denies the Port's motion as to the applicability of § 1365(b)(1)(B) to WAP's complaint.

Second, citizens may not bring suits for civil damages for "any violation . . . with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to" the CWA. 33 U.S.C. § 1319(g)(6)(A)(ii). For this section to apply, "the comparable state law must contain penalty provisions and a penalty must actually have been assessed under the state law." *Knee Deep Cattle Co., Inc. v. Bindana Inv. Co. Ltd.*, 94 F.3d 514, 516 (9th Cir. 1996) (citing *Citizens for a Better Env't v. UNOCAL*, 83 F.3d 1111, 1115 (9th Cir.1996)). A settlement is not a "penalty" even if it involves a payment of money by the alleged violator. *UNOCAL*, 83 F.3d at 1115–16.[2]

In this case, the Port fails to establish that WPA's citizen suit is precluded by § 1319. First, the Port contends that the statute should be interpreted broadly such that any enforcement action for a violation of the permit precludes a citizen suit for any other violation of the same permit. *See, e.g.*, Dkt. 118 at 4 ("Ecology has been, and is currently, aggressively and diligently prosecuting enforcement of the Port's Permit."). The Port cites no authority for this proposition, and it conflicts with § 1319's "any violation" language. Although the Court doubts the Port's position that an enforcement action for one alleged violation of a permit precludes a citizen's suit for any other alleged violation of the same permit, the next issue is dispositive of the Port's position.

---

[2] The Port cites authorities from other circuits that dictate a more encompassing view of penalties in administrative actions. *See, e.g.*, *Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist.*, 382 F.3d 743, 763 (7th Cir. 2004) ("Levying additional penalties on violators who are undertaking massive remedial projects will not bring about compliance any faster or cause the result to be any more effective—it will just cause the result to be more expensively arrived at."). The Court declines to follow these authorities because they directly conflict with Ninth Circuit precedent.

Second, the Port fails to establish that Ecology assessed any penalties for the violations currently asserted by WAP. In 2016, Ecology assessed a fine for failure to implement a proper containment area for the SWTF's liquid chemicals and the Port's failure to notify Ecology of the Port's alteration to its SWTF design. Dkt. 81-6. The Port fails to establish that WAP is piggybacking on these violations or penalties. *See Knee Deep*, 94 F.3d at 516, ("Although the [state agency] assessed a penalty against [the violator] for the June 2, 1993 violation, this one-time assessment is not germane to our decision in this case" because the settlement for later violations did not assess penalties for those violations.). Therefore, the Court denies the Port's motion as to preclusion of the suit under § 1319.

### 2. Good Faith Allegations

Section 505 of the CWA "confers jurisdiction over citizen suits when the citizen-plaintiffs make a good-faith allegation of continuous or intermittent violation[s] . . . ." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 64 (1987). "[A] citizen plaintiff must allege 'a state of either continuous or intermittent violation-that is, a reasonable likelihood that a past polluter will continue to pollute in the future.'" *Sierra Club v. Union Oil Co. of California*, 853 F.2d 667, 669 (9th Cir. 1988) (quoting *Gwaltney*, 484 U.S. at 57).

In this case, the Port argues that WAP has failed to allege ongoing violations and that WAP's allegations are not made in good faith. Dkt. 80 at 36–38. The Port, however, fails to address any specific allegation in WAP's complaint and mostly uses the good faith requirement to cast aspersions on WAP and its counsel. *See, e.g.*, ("WAP was in

constant, secret communication with the duplicitous permit manager, Paul Stasch."). The Court declines to address the Port's legally unsupported and spurious arguments. Instead, the Court will address the ongoing nature of some of WAP's allegations in considering WAP's motion for partial summary judgment. Therefore, the Court denies the Port's motion on these issues.

### 3.    Standing

The Port includes an entire section on standing only to conclude that it is not contesting WAP's assertion of standing at this time. Dkt. 80 at 34–35 ("It begs the question why WAP is using the same individuals and law firm to pursue the same claims that [Olympians for Public Accountability] brought against the Port."). This portion of the brief appears to be used to cast additional aspersions on WAP's members and counsel and does not support a conclusion, let alone any inference, that WAP lacks standing.

## C.    Summary Judgment

### 1.    Standard

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial—e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630.  The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party.  The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim.  *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255).  Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

**2.	Merits**

WAP moves for summary judgment on nine categories of alleged violations of the CWA.  Dkt. 62

### a.    Level 3 Corrective Action

WAP argues that the Port failed to timely complete a Level 3 corrective action when it triggered such a requirement by failing to meet discharge standards in three quarters of 2017. Dkt. 62 at 15–16. The ISGP requires the Port to complete the action no later than September 30, 2018. In response, the Port relies on (1) its erroneous argument that WAP may not seek civil penalties when Ecology is prosecuting an administrative action and (2) its argument that it completed its requirements by entering Agreed Order #16584 with Ecology. Dkt. 80 at 17–20; Dkt. 118 at 9–12. The former argument is rejected because Ecology did not assess civil penalties in the administrative action. *See supra*. The latter argument is unsupported by any authority or provision of the ISGP. *See Knee Deep*, 94 F.3d at 515, 517 (citizen suit allowed to proceed even though State reserved right to seek penalties for violations of settlement agreement). Therefore, the Court grants WAP's motion on this issue concluding that the Port violated the ISGP by failing to complete a Level 3 corrective action by September 30, 2018.

### b.    BMPs

The ISGP requires the Port to implement certain operational source control BMPs at its facility. Dkt. 63-3 at 17–20 (Condition S3.B.4.b.i); Dkt. 62-4 at 19–23 (Condition S3.B.4.b.i). "Operational Source Control BMPs" are defined as "schedule of activities, prohibition of practices, maintenance procedures, employee training, good housekeeping, and other managerial practices to prevent or reduce the pollution of waters of the state." Dkt. 62-3 at 56; Dkt. 62-4 at 64. Although WAP alleges numerous violations of these BMPs, it only moves for summary judgment on three of them. Dkt. 62 at 16.

First, WAP argues that the Port violated Condition S3.B.4.b.i.5 by failing to provide annual Stormwater Pollution Prevention Plan ("SWPPP") training to the longshoremen of ILWU Local 47 and to Weyerhaeuser employees. *Id.* at 16–17. The Port argues that these are not its employees and that some Weyerhaeuser employees did receive some training. WAP counters that the permit does not limit the training only to the Port's employee because it states that training is necessary for "employees who have duties in areas of industrial activities subject to this permit." Dkt. 62-3 at 19. The Court concludes that this appears to be a question of interpretation of the language in the permit. Since neither party provides authority for such interpretation, the Court declines to *sua sponte* address this issue at this time but reserves it for trial. Therefore, the Court denies WAP's motion as to the longshoremen of ILWU Local 47.

Regarding the Weyerhaeuser employees, the Port provides some facts to establish that Weyerhaeuser provided some training to its employees. *See* Dkt. 84, ¶ 13(c). Therefore, the Court denies WAP's motion on this issue because, at a minimum, questions of fact exist for trial.

Second, Condition S3.B.4.b.i.4.c.ii requires all spill kits to include "[a] storm drain plug or cover kit." Dkt. 62-3 at 18. WAP asserts that every inspection report for the Port's tenant Holbrook indicated that its kits did not contain a plug or cover. Dkt. 62 at 17. The Port responds that there are no drains to cover in Holbrook's leased area. Dkt. 80 at 21. This assertion is slightly undermined by the Port's 30(b)(6) witness who testified that he believed and thought that there were two catch basins in the Holbrook area. Dkt. 62-10 at 15. WAP also argues that, even if the Holbrook area does not contain

a catch basin, the permit's requirements for spill kits does not account for imaginary lines drawn by the Port for its tenants. Dkt. 109 at 15. The Court agrees with WAP that there are no exceptions in the permit and the Port fails to provide any authority for the waiver of a permit condition that is unreasonable. Moreover, the Port fails to explain where any spill within Holbrook's area would discharge. For example, fuel leaking from Holbrook's vehicles, which is indicated by the inspection reports, *see* Dkt. 63-22 at 3, could easily mix with stormwater and travel out of its leased area and discharge into another tenant or the Port's drain. The Port short and inadequate response to this issue is insufficient to overcome summary judgment. Therefore, the Court grants WAP's motion as to the violations of Condition S3.B.4.b.i.4.c.ii.

Third, Condition S3.B.4.b.i.2.d requires all dumpsters be under cover or fit with a lid that must remain closed when not in use. Dkt. 62-3 at 16. On March 31, 2016, Ecology inspectors Paul Stasch and John Diamant documented their observation of an overfilled dumpster with no secure lid. Dkt. 63-23 at 4. WAP also submitted photographs of other dumpsters without lids. Dkt. 63-36. The Port argues that WAP has failed to establish that these dumpsters were not being used when observed or photographed. Dkt. 80 at 21. The Court agrees and finds that questions of fact remain for trial on these alleged violations. Therefore, the Court denies WAP's motion on the alleged violation of Condition S3.B.4.b.i.2.d.

     **c.**    **SWPPP**

WAP alleges that the Port's SWPPP does not comply with permit requirements in numerous respects. First, the SWPPP must contain a site map that identifies the

"stormwater drainage and discharge structures and identif[ies], by name, any other party

other than the Permittee that owns any stormwater drainage or discharge structures" and

the "stormwater drainage areas for each stormwater discharge point off-site (including

discharges to ground water) and assign[s] a unique identifying number for each discharge

point." Dkt. 62-3 at 15 (Condition S3.B.1.c and d). WAP asserts that some scupper

holes under a bull rail are not identified in the Port's site map. Dkt. 62 at 18. Although

the Port argues that WAP's motion on this issue is "absurd," Dkt. 80 at 22–23, the Port's

expert admits that water could discharge through these holes, Dkt 83, ¶ 13(c). The expert

then concludes that the site map complies because any discharge would be de minimus.

*Id.* The Port provides no authority for the proposition that it does not need to comply

with Condition S3.B.1.c and d for de minimus stormwater discharge points. *See Gill v.

LDI*, 19 F. Supp. 2d 1188, 1195 (W.D. Wash. 1998) ("liability for violation of the CWA

is strict—there is no de minimis defense."). Therefore, the Court grants WAP's motion

on this issue.

Second, Condition S3.B.2.a of the general permits requires the SWPPP to contain

a facility description. Dkt. 63-2 at 16. WAP asserts that the Port's facility description is

inaccurate because it is over-inclusive of certain industrial activities. Dkt. 62 at 18.

WAP, however, has failed to establish that this is a violation of the permit. While failing

to include a significant industrial activity in a certain location may violate the permit,

WAP fails to convince the Court that the opposite is a violation. Therefore, the Court

denies WAP's motion on this issue.

Third, Condition S3.B.2.c. requires the SWPPP to contain an inventory of materials which is to include the types of materials handled at the site that may be exposed to precipitation or runoff and could result in stormwater pollution. Dkt. 63-2 at 16. WAP alleges that the Port's SWPPP is inaccurate because it does not include corn, which has been handled at the Port since March 31, 2016. Dkt. 62 at 19. The Port submits evidence to establish that its corn shipper requires all cargo operations to cease when a rain event occurs and therefore corn is not a material that is exposed to precipitation. Dkt. 80 at 24. The Court finds that questions of material fact exist on this issue and, as discussed *infra*, WAP may fail to establish ongoing violations for the corn shipments. Therefore, the Court denies WAP's motion on this issue.

Fourth, Condition S3.B.4.a of the 2015 Permit requires the SWPPP to describe each BMP selected and explain in detail how and where the selected BMPs will be implemented. Dkt. 62-4 at 19. WAP alleges generally that the Port fails to explain in detail how and where the BMPs will be implemented. Dkt. 62 at 19. The Port's SWPPP lists hundreds of BMPs and WAP fails to specifically identify a violation of this permit condition at this time. Therefore, the Court denies WAP's motion on this issue.

Fifth, Condition S3.B.4.b.i.6.c requires the SWPPP to "provide a tracking or follow-up procedure to ensure that a report is prepared and any appropriate action taken in response to visual inspections." Dkt. 62-4 at 22. WAP alleges that the Port's SWPPP fails to meet this requirement. Dkt. 62 at 19. The Port respond by citing its spill log procedure and its monthly visual inspection report. Dkt. 80 at 25–26. The spill log procedure seems to be irrelevant to reporting "in response to visual inspections."

Although the Port directs the Court's attention to Appendix D of its SWPPP, it failed to submit the appendices with its SWPPP. *See* Dkt. 84-2. Regardless, the Court concludes that the existence of a monthly inspection report creates material questions of fact for trial on this issue. Therefore, the Court denies WAP's motion on this issue.

### d. Certification

Condition S7.C.1.c requires two people to certify with every monthly inspection report that the Port is either in compliance or out of compliance with the terms and conditions of the SWPPP and the permit. Dkt. 62-4 at 41. WAP alleges that fifty-five inspection reports do not contain a certification by two people. Dkt. 62 at 20. The Port responds requesting sanctions under Rule 11 for asserting such frivolous allegations because the proper Port employee signed each report. Dkt. 80 at 26–28. In WAP's reply, it clarifies that it is not alleging violations for lack of a proper signature but for lack of a proper certification regarding compliance by two people. Dkt. 109 at 19–21. The Port's response to that clarification is that material questions of fact exist for trial. Dkt. 118 at 11:23–25. Contrary to the Port's final position, it has not established material questions of fact as to certification. While Barb Tope included a certification regarding compliance, Racheal Jamison did not. *See, e.g.*, Dkt. 63-28 at 3. Therefore, the Court grants WAP's motion on this issue.

### e. Identical Points

If the Port decides not to sample a particular discharge point because it is substantially identical to a discharge point that is sampled, Condition S3.B.5.b requires the Port to include documentation and reasons to justify its conclusion that the points are

substantially identical.  Dkt. 62-3 at 21–22.  WAP alleges that the Port has violated this requirement because the Port concludes that the wharf discharge points are substantially identical to other points being monitored without proper justification.  Dkt. 62 at 20–21. The Court agrees.  The Port's SWPPP provides in relevant part as follows:

> Most stormwater from Subbasin C discharges through Outfall C. However, some stormwater discharges at locations that are exempt from monitoring, per ISWGP Section 53.B.5.b., because they are "substantially identical" to other locations already being sampled. Those stormwater sources and discharge locations are:
> • Stormwater sheet flows on the wharf that drain to Discharge Points 01 through D52
> • Stormwater sheet flows in Subbasin C that are not routed to the Port's stormwater treatment facility and drain to Discharge Points Pl, P2, P3, and P4.

Dkt. 84-2 at 18.  Not only does the Port fail to provide justification for its substantially identical conclusion, it also fails to identify what the other locations are to make the comparison.  Therefore, the Court grants WAP's motion as to the issue of proper documentation.

A separate issue is whether the Port should be monitoring these points because these points are not substantially identical to other points.  The ISGP defines the phrase as follows:

> Substantially Identical Discharge Point means a discharge point that shares the following characteristics with another discharge point: 1) the same general industrial activities conducted in the drainage area of the discharge point, 2) the same Best Management Practices conducted in the drainage area of the discharge point, 3) the same type of exposed materials located in the drainage area of the discharge point that are likely to be significant contributors of pollutants to stormwater discharges, and 4) the same type of impervious surfaces in the drainage area that could affect the percolation of stormwater runoff into the ground (e.g., asphalt, crushed rock, grass).

Dkt. 62-4 at 67.  The Court concludes that questions of fact exist for trial on this issue.

Therefore, the Court denies WAP's motion as to its allegations that the Port failed to

properly sample these locations.

### f.    Corn Discharges

WAP alleges that the Port discharged corn and corn dust into Budd Inlet in

violation of the CWA.  Dkt. 62 at 23–26.  The Port challenges the factual basis of this

allegation and the legal basis whether such discharges are covered by the permit.  First,

the Port argues that "WAP can point to no admissible evidence that direct discharges of

corn to Budd Inlet occurred, either through direct spill or via Port equipment."  Dkt. 80 at

30.  While this statement is technically true because it only refers to "corn," it fails to

address all WAP's allegations.  For example, WAP alleges that corn and corn dust were

directly discharged into Budd Inlet as well as spilled all over the unloading area.  WAP,

however, fails to provide direct evidence that corn was directly discharged during

offloading or whether any corn that was spilled on the Port's property made it into the

storm drains.  Thus, the Court denies WAP's motion on the issue of discharging corn

because at a minimum questions of material fact exist for trial.

Regarding the corn dust, WAP has submitted the declaration of Shawn Munger, an

individual who lives near the Port in Budd Inlet, Dkt. 65, ¶ 3, and the inspection report of

Paul Stash, Dkt. 63-23.  Both of these documents contain direct evidence of corn dust

falling into Budd Inlet.  In fact, Mr. Munger declares that on March 31, 2016, he saw

corn dust emanating from the Port's offloading and falling into Budd Inlet as well as blanketing his boat. *Id.* The Port fails to rebut these facts.

Second, the Port counters with three legal arguments, two of which are without merit. The Port contends that it obtained a permit under Washington's Clean Air Act approving the discharge of corn dust. Dkt. 62 at 24. The Port, however, fails to articulate how this permit precludes its compliance with the CWA or its ISGP. Thus, the argument is unsupported and facially absurd. Similarly, the Port argues that the corn dust was "de minimus and does not constitute an illicit discharge under the Permit." Dkt. 80 at 30 (citing the declaration of their retained expert). There is no "de minimus" defense to a CWA violation. *Sierra Club v. Union Oil of California*, 813 F.2d 1480, 1490–91 (9th Cir.1987), *vacated*, 485 U.S. 931 (1988), *reinstated*, 853 F.2d 667 (9th Cir.1988); *Gill*, 19 F. Supp. 2d at 1195 ("liability for violation of the CWA is strict—there is no de minimis defense."). Therefore, the Court rejects these arguments.

The Port's third legal argument is that it ended the shipments of corn and that there is no significant likelihood of future corn shipments. Dkt. 80 at 31. This raises the issue whether the Court has jurisdiction to consider this alleged violation because WAP may only bring a citizen suit for ongoing violations. Dkt. 109 at 25. WAP responds that the violation is ongoing because the Port received one shipment of corn after WAP filed its complaint. Dkt. 109 at 25. WAP, however, fails to submit any evidence that this shipment involved any violation of the CWA. In other words, WAP's evidence of corn dust entering Budd Inlet relates to the March 31, 2016 shipment, which predates the complaint and could be considered a wholly past violation. Therefore, the Court denies

WAP's motion on the issue of corn shipments because questions of fact remain regarding jurisdiction.

### g. Bark Discharges

WAP alleges that the Port illegally discharged bark. Dkt. 62 at 26–28. On June 7, 2019, the Court denied WAP's motion for leave to amend to add supplemental claims for illegal discharges of bark. Dkt. 53. WAP now contends that it supplemental notice of intent to sue letter and motion for leave to amend were only submitted in an abundance of caution and that its original letter and original complaint are broad enough to cover these allegations. Dkt. 62 at 26 n.14. The Court disagrees with WAP and denies WAP's motion on these allegations because they are outside the scope of WAP's operative complaint.

### h. Significant Process Change

WAP alleges that the Port's importation of corn and exportation of livestock constitute significant process changes under the permit and that the Port failed to comply with permit requirements regarding these changes. Dkt. 62 at 28–29. The Port relies on a letter from Ecology stating that a significant process change did not occur on March 31, 2016 when the Port offloaded corn. Dkt. 81-8. That letter does not absolve the Port from complying with the CWA. *Ass'n to Protect Hammersley, Eld, & Totten Inlets v. Taylor Res., Inc.*, 299 F.3d 1007, 1012 (9th Cir. 2002) ("Although the EPA or an authorized state agency may be charged with enforcement of the Clean Water Act, neither the text of the Act nor its legislative history expressly grants to the EPA or such a state agency the exclusive authority to decide whether the release of a substance into the waters of the

United States violates the Clean Water Act."). Ecology's letter "warrants consideration," but it is not dispositive of the issue. *Id.*

The permit requires significant process change compliance when the Port adds a new industrial activity. Dkt. 62-3 at 58. WAP argues that corn and livestock constitute a new industrial activity and require a new code 4221. Dkt. 109 at 26. WAP submitted the Department of Labor's description of this code which provides that the code is for "[e]stablishments primarily engaged in the warehousing and storage of farm products." Dkt. 63-33. WAP has failed to establish that the Port is primarily engaged in the importation of corn or exportation of livestock. WAP has also failed to establish that the permit requires a significant process change every time the Port engages in a new industrial activity such as the four times it imported corn. In other words, the Court will require more authorities and arguments on this issue at trial and denies WAP's motion on this issue.

### i. Denying Access

WAP alleges that the Port violated the permit by denying access to Ecology's inspectors. Dkt. 62 at 29–31. The Port denies these allegations, asserts that the permit requires access at "reasonable times," and provides numerous facts in support of its position that its restrictions of access was reasonable. Dkt. 80 at 32–34. The Court agrees with the Port that material questions of fact exist for trial on this issue and denies WAP's motion on this issue.

# IV. ORDER

Therefore, it is hereby **ORDERED** that WAP's motion for summary judgment, Dkt. 62, is **GRANTED in part** and **DENIED in part** and Port's cross motion for summary judgment, Dkt. 80, is **DENIED**.

Dated this 21st day of November, 2019.

_____
BENJAMIN H. SETTLE
United States District Judge